| | | |
|---|---|---|
| JANICE THOMAS and<br>PLAINTIFFS Y and Z,<br><br>    Plaintiffs,<br><br>v.<br><br>JEAN K. BUTZEN, President<br>Lakefront Supportive Housing and<br>Lakefront SRO Corporation, CITY<br>OF CHICAGO, CHICAGO HOUSING<br>AUTHORITY, an Illinois Municipal<br>Corporation, CHICAGO HOUSING<br>AUTHORITY CORPORATION, INC. –<br>THE HOUSING CHOICE VOUCHER<br>PROGRAM,  CYNTHIA DEAN, Official<br>of Lakefront Supportive Housing and<br>Lakefront SRO Corporation, HELMUT<br>JAHN, Architect, LAKEFRONT SRO<br>CORPORATION & SUPPORTIVE<br>HOUSING, CAROL J. WETMORE,<br>or current Chair, Board of Directors,<br>Lakefront SRO Corporation,<br>NATIONAL CORPORATION FOR<br>SUPPORTIVE HOUSING, JANICE D.<br>SCHAKOWSKY, Congresswoman,<br>STATE OF ILLINOIS and UNITED<br>STATES DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04 C 5555<br><br>Judge Ronald A. Guzmán |

## MEMORANDUM OPINION AND ORDER

Janice Thomas and Plaintiffs Y and Z, proceeding *pro se*, have sued defendants Jean Butzen,

the City of Chicago ("City"), Chicago Housing Authority ("CHA")[1], Cynthia Dean, Helmut Jahn,

---

[1]Plaintiffs have also named Chicago Housing Authority Corporation, Inc. – Housing
Choice Voucher Program ("CHAC") as a defendant.  This defendant has not been served in the

Lakefront SRO Corporation ("Lakefront"), National Corporation for Supportive Housing, Carol Wetmore, United States Representative Janice Schakowsky, the State of Illinois and the United States Department of Housing and Urban Development ("HUD"), on behalf of themselves, and all others similarly situated, for defendants' alleged violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, the Quality Housing and Work Responsibility Act of 1998 ("QHWRA"), 42 U.S.C. §§ 1437c-1(d)(15), d(l)(6), d(l)(7), the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), Executive Orders 11063 and 12982 and 42 U.S.C. §§ 1982, 1983 in connection with Lakefront's operation of its current facilities and its proposed construction of a new facility.[2] Defendants have filed a joint motion pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) and (b)(6) to dismiss the claims asserted against them. For the reasons set forth below, the Court grants the motion in part and denies it in part.

### The Legal Standard

On motions to dismiss pursuant to Rule 12(b)(6) and Rule 12(b)(1), the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2002) (Rule 12(b)(1)); *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000) (Rule 12(b)(6)). No claim

---

year since this case was filed. Thus, the Court dismisses CHAC as a party pursuant to Rule 4 for lack of timely service.

[2]The Court notes that while plaintiffs sue for violations of these specific laws, they do not state that they seek review of any agency action pursuant to the Administrative Procedures Act, 5 U.S.C. § 706(2). Even if they had, their complaints are too amorphous to pinpoint any particular agency action upon which to base such a claim.

will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## Discussion

### Anonymous Plaintiffs

As an initial matter, we address the propriety of Plaintiffs Y and Z suing anonymously. Identification of parties is required both by Rule 10 and the First Amendment. *See Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981) ("Public access to [party names] is more than a . . . procedural formality; First Amendment guarantees are implicated when a court decides to restrict public scrutiny of judicial proceedings."). "The presumption that parties' identities are public information . . . can be rebutted by showing that the harm to the plaintiff . . . exceeds the likely harm from concealment." *Doe v. City of Chi.*, 360 F.3d 667, 669 (7th Cir. 2004). The balance may tip in favor of concealment when the plaintiff is, among other things, a minor, a rape victim or "a likely target of retaliation by people who would learn her identity only from a judicial opinion or other court filing." *Id.* Plaintiffs Y and Z say they are suing anonymously because they fear retaliation. (*See* Compl. ¶ 8 (stating that plaintiffs Y and Z "shall be unnamed because they received death threats, false arrests . . . , wrongful evictions, release of faked mental and medical health records and other discriminatory treatment at the hands of the site management").) Yet, in their reply brief, Plaintiffs Y and Z are identified as Keith Richardson and Ethel Williams, respectively. (*See* Reply at 13.) Because Richardson and Williams are now publicly identified, the Court treats the complaint as if it had named them.

3

## Subject Matter Jurisdiction

Plaintiffs appear to assert four categories of claims: (1) those that seek to enjoin Lakefront's allegedly unlawful current operations; (2) those that seek damages for Lakefront's allegedly unlawful past operations; (3) those that contest Lakefront's alleged plan to perpetuate its unlawful conduct by opening a new facility; and (4) those that challenge as illegal or unconstitutional specific actions taken against Thomas. Plaintiffs have standing to pursue these claims only if they were injured by defendants' conduct and that injury is likely to be redressed by a decision in their favor. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

Plaintiffs allege that Williams is a tenant of Lakefront but that Thomas and Richardson are not. (*See* Compl. ¶ 7; Reply at 12-14.) Because Thomas and Richardson do not live in a Lakefront facility, they are not injured by Lakefront's current operation of those facilities, even if it is unlawful. Consequently, only Williams has standing to pursue the first category of claims, seeking an injunction against Lakefront's enforcement of its current lease provisions and operational policies.

All three plaintiffs, however, have standing to sue for the second category of claims. To the extent defendants violated their rights while they allegedly were Lakefront tenants, plaintiffs can sue to recover damages for those injuries even though they no longer reside in a Lakefront facility. *Lujan,* 504 U.S. at 560-61.

The third category of claims, pertaining to the perpetuation of discrimination at the new building, is not ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300 (1998) (quotation omitted). Plaintiffs' claims that Lakefront will perpetuate its alleged discrimination at the proposed new facility is based on their assumptions as to future events; that is,

4

they assume that the proposed building will, in fact, be built and that the allegedly discriminatory policies in effect at other Lakefront facilities will be put into effect there. Unless and until those events occur, however, the new facility claims are not ripe. *Id.*

Moreover, even if those claims were ripe, none of the plaintiffs would have standing to pursue them. Plaintiffs do not allege that they are going to, or even that they are likely to, reside in the facility Lakefront plans to construct. Absent allegations that Lakefront's alleged discrimination at the new building will injure them personally, plaintiffs lack standing to pursue the new facility claims. *Lujan,* 504 U.S. at 560-61.

That leaves: (1) Williams' claim to enjoin Lakefront's allegedly illegally operation of its existing facilities; (2) all three plaintiffs' damage claims for rights violations they allegedly suffered while they were tenants of Lakefront; and (3) Thomas' claims that defendants violated her First Amendment rights by retaliating against her for publishing a newsletter, her Fourth Amendment rights by falsely arresting her and her Fourteenth Amendment[3] right to review documents prior to an eviction proceeding.[4] Plaintiffs assert these claims against Lakefront, Lakefront employees Jean Butzen, Cynthia Dean and Carol Wetmore, Helmut Jahn, the City, CHA, United States

---

[3]All three plaintiffs attempt to assert that defendants have violated their equal protection rights as guaranteed under the Fourteenth Amendment regarding the municipal set-aside program ordinance, Cook County, Ill., Ordinance 88-0-29 (May 2, 1988), as amended, which requires a minimum percentage of the total value of any county construction contract to be awarded to minority business enterprises ("MBEs"). However, they fail to allege that any of them have qualified to be an MBE such that any of the plaintiffs would have standing to sue as to this claim.

[4]Thomas actually grounds this claim in 42 U.S.C. § 1437(d)(l)(7). As explained below, however, that statute does not confer on her a right to review documents prior to being evicted. Thus, we have construed this claim as being brought under the Fourteenth Amendment.

Representative Janice Schakowsky, the State of Illinois and HUD, and they seek monetary, injunctive and declaratory relief.

The State of Illinois contends that it is immune from plaintiffs' claims. Though the Eleventh Amendment generally gives states immunity from suit in federal court, *Darne v. Wisconsin Department of Revenue*, 137 F.3d 484, 487 (7th Cir. 1998), there are exceptions to this rule:

> First, suits against state officials seeking prospective equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment. Second, individuals may sue directly a state when Congress has abrogated the immunity in unequivocal terms and pursuant to a valid exercise of its own power. Finally, a suit may be brought against a state directly when a state has waived its immunity and validly consented to suit in federal court.

*Id.* at 488. Plaintiffs' claims do not fall within any of these exceptions. Thus, their claims are barred by the Eleventh Amendment. *Id.*[5]

Congresswoman Schakowsky also contends that she is immune from plaintiffs' claims. The Court agrees. Plaintiffs seek to hold the Congresswoman liable for supporting public housing legislation. (*See* Compl. ¶ 10.) Such claims are barred by the Speech and Debate Clause of the Constitution. *See* U.S. CONST., art. I, § 6, cl. 1 ("[F]or any Speech or Debate in either House, [members of Congress] shall not be questioned in any other Place."); *Doe v. McMillan*, 412 U.S. 306, 311-12 (1973) (stating that members of Congress are protected from suit arising from their activities within the "sphere of legitimate legislative activity," which includes voting on legislation) (quotation omitted). The claims against Congresswoman Schakowsky must, therefore, be dismissed.

---

[5]Even if the State were not immune, we would have no power to enjoin the State Legislature, or any other legislative body, from enacting legislation pertaining to Lakefront's proposed facility. *See New Orleans Water Works Co. v. City of New Orleans,* 164 U.S. 471, 481 (1896) ("[A] court of equity cannot properly interfere with, or in advance restrain, the discretion of a municipal body while it is in the exercise of powers that are legislative in their character."). Thus, plaintiffs' requests for such injunctions are stricken.

HUD says that the doctrine of sovereign immunity shields it from this suit. Sovereign immunity protects the federal government and its agencies from being sued without their consent. *FDIC v. Meyer,* 510 U.S. 471, 475 (1994). The government can waive that immunity, but such a waiver "must be unequivocally expressed." *Lane v. Pena,* 518 U.S. 187, 192 (1996). There is no waiver of sovereign immunity for HUD in the FHA, the QHWRA, the Housing Choice Voucher Program or Executive Orders 11063 and 12982. Thus, any damages claims plaintiffs assert against HUD for its alleged violations of those statutes must be dismissed.

Sovereign immunity does not, however, shield HUD from any damages claims plaintiffs assert against it for violating 42 U.S.C. § 1982. *Baker v. F& F Inventory Co.,* 489 F.2d 829, 833 (7th Cir. 1973) (stating that the "sue and be sued clause" of the National Housing Act, 12 U.S.C. § 1702 waives HUD's sovereign immunity for 42 U.S.C. § 1982 claims). The *Baker* decision has been criticized by courts outside of this circuit. *See, e.g., Selden Apartments v. U.S. Dep't of Hous. & Urban Dev.,* 785 F.2d 152, 156-59 (6th Cir. 1986) (rejecting the reasoning of *Baker,* discussing contrary authority from other jurisdictions and holding that HUD is immune from 42 U.S.C. § 1982 suits for damages). In *Federal Deposit Insurance Corp. v. Citizens Bank & Trust Co. of Park Ridge,* 592 F.2d 364 (7th Cir. 1979), the Seventh Circuit overruled another of *Baker's* holdings, that federal agencies subject to sue-and-be-sued provisions could be sued for torts not covered by the Federal Tort Claims Act. *Id.* at 371. But it did not reject *Baker's* holding that HUD was not immune from section 1982 claims. On the contrary, the court underscored the vitality of that holding, noting that it had previously "cited [the case] for its discussion of 42 U.S.C. ss 1981 and 1982." *See id.* at 371 n.9 (citing *City of Milwaukee v. Saxbe,* 546 F.2d 693, 703 (7th Cir. 1976)). In short, *Baker* remains

the law of this circuit. Thus, HUD is not immune from plaintiffs' 42 U.S.C. § 1982 claims for damages.[6]

## Abstention

Even if jurisdiction exists, defendants urge us to abstain from exercising it under the *Younger* doctrine. That doctrine "forbids federal district courts to interfere with certain types of state court proceedings." *Lynk v. LaPorte Superior Court No. 2*, 789 F.2d 554, 558 (7th Cir. 1986). To determine whether *Younger* abstention is proper, we must examine the relief sought in both cases to determine whether resolution of the federal court case "will unduly interfere with the ongoing state proceedings." *Am. Fed'n of State, County & Mun. Employees v. Tristano*, 898 F.2d 1302, 1305 (7th Cir. 1990). Thomas is the sole plaintiff in the state court suit. (*See* Defs.' Mem. Supp. Joint Mot. Dismiss, Ex. C, First Am. Compl. Case No. 04-CH-3670.) She is suing Carolyn Stanley, a Lakefront employee, Lakefront, CHAC, CHA and Congresswoman Schakowsky. (*Id.* at 1-2.) She alleges that defendants evicted her in violation of state law and a City ordinance and wrongfully appropriated her mail. (*See id.* at 5-10.) Thomas does not raise in that suit the federal claims she raises here. Because the claims raised in the two suits are distinct, resolution of this case will not interfere with the state court action. *See Am. Fed'n of State, County & Mun. Employees*, 898 F.2d at 1305 (holding that "the district court erred in dismissing the plaintiffs' claims based on *Younger* abstention" because "[t]he relief requested in federal court, if granted, would not unduly interfere with the state

---

[6]Defendants also argue the Court lacks jurisdiction because plaintiffs have not alleged that they acted under color of state law or participated in any constitutional deprivations. (*See* Mem. Supp. Defs.' Joint Mot. Dismiss at 10-15.) Those arguments, however, go to the merits of plaintiffs' claims not the Court's jurisdiction over them. Thus, they are discussed in the merits section.

proceedings"). Defendants' motion to dismiss on the grounds of *Younger* abstention is, therefore, denied.

## The Merits

Plaintiffs contend that defendants' actions violated their rights under 42 U.S.C. § ("section") 1982, which states: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." To state a viable section 1982 claim, plaintiffs must allege that defendants "had a racial animus, intended to discriminate against the plaintiff[s] and deprived [them] of protected rights because of [their] race." *Whisby-Myers v. Kiekenapp*, 293 F. Supp.2d 845, 850 (N.D. Ill. 2003). The only right protected by section 1982 that is even arguably implicated by plaintiffs' complaint is the right to lease property. Read favorably to plaintiffs, their complaint alleges that Lakefront terminated their leases or otherwise subjected them to unfavorable lease terms solely because of their race and that CHA and HUD participated in, or condoned, Lakefront's conduct. Plaintiffs do not allege, however, that the City, the National Corporation for Supportive Housing ("NCSH"), or Jahn, Butzen, Dean or Wetmore, individually, did anything to deprive them of their right to lease property. Accordingly, any section 1982 claims asserted against those defendants is dismissed.

Any section 1982 claims that plaintiffs assert against Butzen, Dean and Wetmore in their official capacities must also be dismissed. Asserting a claim against an employee in her official capacity is the same as suing the entity that employs her. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Any official capacity claims asserted against these defendants are redundant of Thomas'

9

claims against their employer, Lakefront. Accordingly, any section 1982 official capacity claims asserted against Butzen, Dean and Wetmore are also dismissed.

The rest of plaintiffs' claims are grounded in section 1983. That statute provides redress for people whose federal rights are violated "under color of state law." 42 U.S.C. § 1983. HUD, as a federal agency, acts under color of federal law. Thus, it is not subject to section 1983. *City of Milwaukee*, 546 F.2d at 703 (7th Cir. 1976) ("We agree . . . that, insofar as City complains of acts done by the defendants under color of federal law rather than state law, § 1983 does not apply.")[7]

The bulk of plaintiffs' remaining section 1983 claims are grounded in defendants' alleged violations of section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA, the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), and Executive Orders 11063 and 12892. Defendants say that none of these statutes creates rights that can be vindicated through section 1983.

Plaintiffs, relying primarily on *Wallace v. Chicago Housing Authority*, 298 F. Supp. 2d 710 (N.D. Ill. 2003), disagree. The plaintiffs in *Wallace* were CHA residents who were subject to relocation when CHA demolished their high-rise buildings. *Id.* at 714. The *Wallace* plaintiffs claimed that CHA failed to provide them with adequate relocation services or gave them services that steered them into neighborhoods that were predominantly African-American. *Id.* Plaintiffs claimed that CHA's actions violated, among other laws, section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA and Executive Orders 11063 and 12892. *Id.* at 715.

Section 3608(e)(5) of the FHA requires the Secretary of HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the

---

[7]Like HUD, the State could not be sued under sued under section 1983, even if it did not have sovereign immunity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (holding that states are not among the class of persons subject to suit under section 1983).

policies of this subchapter." 42 U.S.C. § 3608(e)(5). Section 1437c-1(d)(15) of the QHWRA requires public housing agencies like CHA to submit a plan to HUD every five years that contains, among other things, the agency's certification that it "will affirmatively further fair housing." 42 U.S.C. § 1437c-1(d)(15). Executive Orders 11063 and 12892, respectively, require the heads of federal agencies to "take all action necessary and appropriate to prevent discrimination because of race, color, creed, or national origin [with respect to housing]" and to "ensur[e] that [their] programs and activities relating to housing and urban development are administered in a manner affirmatively to further the goal of fair housing." Executive Order 11063, 27 Fed. Reg. 11527 (Nov. 20, 1962); Executive Order 12892, 59 Fed. Reg. 2939 (Jan. 17, 1994).

In *Wallace*, CHA moved to dismiss plaintiffs' claims, arguing that none of those provisions creates rights cognizable under section 1983. *Wallace*, 289 F. Supp. 2d at 717. The Wallace Court disagreed. A statute confers an enforceable right, this Court held, if: plaintiffs were the intended beneficiaries of the provision, the right allegedly conferred is not "'so vague and amorphous' that its enforcement would strain judicial competence" and the provision is couched in mandatory terms. *Id.* at 717 n.3 (quoting *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997)). In the Wallace Court's view, all of the provisions cited by plaintiffs create rights that can be enforced through a section 1983 suit. *See id.* at 718-21.

In reaching this conclusion, The Court relied heavily on *Langlois v. Abington Housing Authority*, 234 F. Supp. 2d 33 (D. Mass. 2002). *See Wallace*, 289 F. Supp. 2d at 718 ("As discussed in more detail below, we agree with the court's reasoning in *Langlois* . . . .").) In *Langlois*, a group of Massachusetts housing authority residents brought section 1983 claims against those agencies for their alleged violations of section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA

11

and Executive Orders 11063 and 12892 in their administration of federal housing programs. *Langlois*, 234 F. Supp. 2d at 37, 46. As in *Wallace* and the instant case, the defendants in *Langlois* moved to dismiss on the grounds that those provisions did not confer enforceable rights. *Id.* at 37.

The *Langlois* court did not substantively address section 1437c-1(d)(15) of the QHWRA, because it was not in effect at the time of the contested conduct, but held that section 3608(e)(5) of the FHA creates enforceable rights and, because they are incorporated into the FHA, the Executive Orders do as well. *Id.* at 70-78. In the court's words:

> Section 3608(e)(5) . . . meets the *Blessing* criteria. It could not be clearer from the statute, the legislative history, and the case law construing it that this provision was intended to benefit the plaintiffs here: people in desperate need of access to fair housing, minorities and the poor.
>
> Nor is the duty to affirmatively further too vague and amorphous for the courts to enforce. Essentially, as the Court in *Blessing* noted, this is an issue of judicial competence. As noted above, it is an antidiscrimination statute and few discrimination statutes are more specific. Judicial decisions and administrative regulations have given content to these provisions over the past twenty years. . . . The final *Blessing* criterion – whether the statutory language at issue imposes an unambiguous and binding obligation on the state – is also met here. The language of the statute is mandatory: it provides that the Secretary "shall" administer the relevant programs in a manner affirmatively to further the policies of the statutory subchapter.

*Id.* at 72-73 (citation omitted). The *Wallace* court adopted this analysis almost verbatim:

> [W]e believe that the provisions § 3608(e)(5) of the Fair Housing Act easily pass the *Blessing* test. *See Langlois*, 234 F. Supp. 2d at 71-72. At issue in this case is the first prong of the *Blessing* test, because there is little dispute that the language of the act is mandatory; nor can the parties seriously contend that a claim under the Fair Housing Act strains judicial competence. . . . With respect to this first prong, we agree with the *Langlois* court that "[i]t could not be clearer from the statute, the legislative history, and the case law construing it, that [§ 3608(e)(5) ] was intended to benefit the plaintiffs here: people in desperate need of access to fair housing, minorities and the poor." *Id.* at 72. . . . Thus, for the foregoing reasons, we hold that Plaintiffs may sue under § 1983 to combat a violation of § 3608(e)(5) of the Fair Housing Act.

12

*Wallace*, 298 F. Supp. 2d at 719.

With due respect to those courts, we believe that the *Langlois* and *Wallace* decisions do not comport with *Blessing* and run counter to the trend of Supreme Court authority in this area. In particular, *Langlois* and *Wallace* give short shrift to the second part of the *Blessing* test: whether "the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340-41 (quotation omitted). About that part of the test, the *Blessing* Court said:

> [T]he lower court's holding that Title IV-D "creates enforceable rights" paints with too broad a brush. It was incumbent upon respondents to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined "rights." Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights.
>
> In prior cases, we have been able to determine whether or not a statute created a given right because the plaintiffs articulated, and lower courts evaluated, well-defined claims. In *Wright,* for example, we held that tenants of public housing projects had a right to have their utility costs included within a rental payment that did not exceed 30 percent of their income. We did not ask whether the federal housing legislation generally gave rise to rights; rather, we focused our analysis on a specific statutory provision limiting "rent" to 30 percent of a tenant's income. Similarly, in *Wilder,* we held that health care providers had an enforceable right to reimbursement at "reasonable and adequate rates" as required by a particular provision in the Medicaid statute. And in *Suter v. Artist M.,* where we held that Title IV-E of the Social Security Act did not give the plaintiffs the right that they asserted, we again analyzed the claim in very specific terms: whether children had a right to have state authorities undertake "reasonable efforts to prevent removal of children from their homes and to facilitate reunification of families where removal had occurred." Finally, in *Livadas,* we discerned in the structure of the National Labor Relations Act (NLRA) the very specific right of employees "to complete the collective-bargaining process and agree to an arbitration clause." We did not simply ask whether the NLRA created unspecified "rights."

*Id.*, 520 U.S. at 342-43 (citations omitted). The *Langlois* court's reduction of this part of the test to "[e]ssentially . . . an issue of judicial competence," *see Langlois*, 234 F. Supp. 2d at 73, is a gross oversimplification.

*Blessing*'s insistence that section 1983 plaintiffs identify specific rights that they contend are conferred by a statute is just one of a series of qualifications that the Court has added to the creation-of-rights analysis since its appearance in *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990). The *Wilder* Court said that a federal statute creates an enforceable right if "the provision . . . was intend[ed] to benefit the putative plaintiff," it reflects a "binding obligation on the governmental unit" and the asserted right is not "too vague and amorphous such that it is beyond the competence of the judiciary to enforce." *Id.* at 509 (quotations omitted). The *Wilder* Court applied that test to the Boren Amendment, which conditioned states' receipt of federal Medicaid funds on their submission to the Secretary of Health and Human Services ("HHS") of a plan that provided for payments to medical service providers that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." *Id.* at 502-03. The Court concluded that the medical service providers were the "intended beneficiaries of the Boren Amendment" because it explicitly requires state plans to provide for payment to them. *Id.* at 510. The Court also said that the Amendment reflected a binding obligation because it requires, rather than permits, state plans to provide for reasonable payments. *Id.* at 512. Moreover, the Court said,

> [t]hat the amendment gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the amendment, but it does not render the amendment unenforceable by a court. While there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act. Although some knowledge of the hospital industry might be required to evaluate a State's findings with respect to the

14

reasonableness of its rates, such an inquiry is well within the competence of the Judiciary.

*Id.* at 519-20 (footnote omitted). Thus, the Court concluded that "the Act creates a right enforceable by health care providers under § 1983 to the adoption of reimbursement rates that are reasonable and adequate to meet the costs of an efficiently and economically operated facility that provides care to Medicaid patients." *Id.* at 509-10.

Not long after it was decided, the Court started to back away from *Wilder*. Two years later, the Court decided *Suter v. Artist M.*, 503 U.S. 347 (1992), a case in which children who are or were wards of the Illinois Department of Children and Family Services sued the agency under section 1983 for its alleged violation of the Adoption Assistance and Child Welfare Act. *Id.* at 350-53. That statute enables a state to be reimbursed for a percentage of foster care and adoption assistance costs if it submits a plan to the Secretary of HHS certifying that "'reasonable efforts will be made . . . to prevent or eliminate the need for removal of the child from his home, and . . . to make it possible for the child to return to his home.'" *Id.* at 351 (quoting 42 U.S.C. § 671(a)(15)). The plaintiff-children said that provision of the statute conferred upon them a right to have the State make reasonable efforts to keep them in and return them to their homes. *Id.* at 352-53.

The similarities between the statute at issue in *Wilder* and that at issue in *Artist M.* are striking: both are funding statutes enacted under Congress' spending power, both frame the state agencies' obligation in terms of reasonableness and neither defines "reasonable." Yet, the *Artist M.* Court reached the opposite result. *Id.* at 350. The Adoption Act, the Court said, does not require the states to have plans certifying that they will use reasonable efforts to keep the children in or return them to their homes. *Id.* at 358. Rather, the Court said, the statute simply requires the states

to "have a plan approved by the Secretary [of HHS] which contains the 16 listed features." *Id.* But the same could be said of the statute at issue in *Wilder*, which the *Artist M.* Court did not mention in this section, because it requires the states to submit a Medicaid plan that contains some or all of each of 50 listed features. *Compare* 42 U.S.C. § 671(a) (construed in *Artist M.*), *with* 42 U.S.C. § 1396a (1990) (construed in *Wilder*).

Moreover, when the Court did distinguish *Wilder*, as the dissenters noted, its reasoning was less than compelling. *See* 503 U.S. at 365. The Medicaid legislation was different from the Adoption Act, the Court said, because the former "set forth in some detail the factors to be considered" in determining reasonable reimbursement rates while the latter contained "[n]o further statutory guidance . . . as to how 'reasonable efforts' [to keep children in their homes] are to be measured." *Id.* at 359-60. In reality, the "detail[ed] . . . factors" set forth in the Medicaid statute are broad considerations that do little to inform the reasonableness determination. *See Wilder*, 496 U.S. at 519 n.17 (listing the considerations as: "(1) the unique situation (financial and otherwise) of a hospital that serves a disproportionate number of low income patients, (2) the statutory requirements for adequate care in a nursing home, and (3) the special situation of hospitals providing inpatient care when long-term care at a nursing home would be sufficient but is unavailable.").

The conflict between *Wilder* and *Artist M.* did not go unnoticed by Justices Blackmun and Stevens, who dissented from the opinion:

> [T]he Court's conclusion is plainly inconsistent with this Court's decision just two Terms ago in *Wilder v. Virginia Hospital Assn.*, 496 U.S. 498, 110 S. Ct. 2510, 110 L. Ed. 2d 455 (1990), in which we found enforceable under § 1983 a functionally identical provision of the Medicaid Act requiring "reasonable" reimbursements to health-care providers. More troubling still, the Court reaches its conclusion without even stating, much less applying, the principles our precedents have used to determine whether a statute has created a right enforceable under § 1983.

503 U.S. at 365. But the retreat from *Wilder* continued.

In 1997, the Court decided *Blessing*. 520 U.S. 329. In that opinion, the Court adhered to the three-part test announced in *Wilder* but, as discussed above, required that the right allegedly created be specifically defined. *Id.* at 342-43.

In 2002, the Court refined the test even further in *Gonzaga University v. Doe*, 536 U.S. 273 (2002). In that case, a graduate of Gonzaga sued the school for its disclosure to a state agency that he was under investigation for sexual misconduct. *Id.* at 277. Plaintiff claimed that the University's actions violated the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, which prohibits federal funding of schools that have a practice of releasing education records to unauthorized persons. *Id.* at 276-77. Relying on *Wilder* and *Blessing*, plaintiff argued that there is "a relatively loose standard for finding rights enforceable by § 1983." *Id.* at 282. A statute creates such a right, he argued, "so long as Congress intended that the statute 'benefit' putative plaintiffs." *Id.*

After acknowledging that its opinions "might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983," *id.* at 282, the Court said: "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283. Further, the Court "reject[ed] the notion that [its] implied right of action cases are separate and distinct from [its] § 1983 cases." *Id.* A court's role, in both contexts, the Court said, is to "determine whether Congress intended to create a federal right." *Id.* (emphasis omitted). Thus, the Court concluded, "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

17

The *Langlois* and *Wallace* courts do not analyze this line of cases in depth or remark on the

Supreme Court's steady retreat from *Wilder*. Moreover, though the *Wallace* court does discuss

*Gonzaga*, it concludes that the reasoning of the case is limited to statutes enacted pursuant to

Congress' spending power. *Wallace*, 289 F. Supp. 2d at 718. But the opinion contains no such

limitation. Rather, it says that a statute can support a section 1983 claim only if it unambiguously

confers an individual right, a standard that spending power statutes are highly unlikely to meet.

*Gonzaga*, 536 U.S. at 280-86.

Given the jurisprudence in this area, this Court is required to follow the *Wilder* test as

modified by *Blessing* and *Gonzaga* and determine whether the text and structure of any of the

statutes cited by plaintiff indicate that Congress intended to create enforceable rights.

The text and structure of the FHA clearly evince Congress' intent that section 3608(e)(5) not

confer an enforceable, individual right. The statute contains an express right of action that permits

any "aggrieved person [to] commence a civil action . . . not later than 2 years after the occurrence

or the termination of an alleged discriminatory housing practice . . . to obtain appropriate relief with

respect to such discriminatory housing practice . . . ." 42 U.S.C. § 3613. The statute defines

"discriminatory housing practice" as an act that is unlawful under sections 3604 [, which governs

discrimination in the sale or rental of housing], 3605 [,which governs discrimination in residential

real estate-related transactions], 3606 [,which governs discrimination in provision of brokerage

services] or 3617 [which prohibits coercion and intimidation of people who exercise their FHA

rights]. . . ." 42 U.S.C. § 3602(f). A housing authority's failure to further fair housing is not a

discriminatory housing practice actionable under section 3613, nor is it the subject of a separate

cause of action in the statute. The existence of an express cause of action in the FHA that does not

encompass section 3608(e)(5) strongly suggests that Congress did not intend section 3608(e)(5) to create enforceable rights.

The language of section 3608, itself, bolsters that conclusion. The title of that section is "Administration." Subsection e, which is entitled "Functions of the Secretary," contains a laundry list of the Secretary's duties, such as making studies and publishing reports about the state of housing discrimination. The duty upon which plaintiffs seize is fifth in this list: "[to] administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(e)(5). The fact that this duty appears in a section devoted solely to HUD's ministerial duties sharply undercuts plaintiffs' claim that Congress intended that duty to confer enforceable rights on them.

Moreover, the right allegedly conferred by section 3608(e)(5) is "'[too] vague and amorphous'" to be enforceable. *See Blessing,* 520 U.S. at 340-41. That section does not define HUD's duty to further fair housing or place any parameters on it. If violations of that duty could be redressed via section 1983, virtually any act or omission of HUD with respect to housing would be subject to judicial review. Neither the federal nor the state judicial system has the authority, resources or expertise to become HUD's overseer, the position plaintiffs' interpretation of section 3608(e)(5) would impose on them.

In short, there is nothing in section 3608(e)(5) in particular, or the FHA in general, that suggests Congress intended for HUD's duty to further fair housing to confer enforceable rights on individuals like plaintiffs. Plaintiffs' section 1983 claims based on that section are, therefore, dismissed with prejudice.

Plaintiffs' section 1983 claims grounded in section 1437c-1(d)(15) of the QHWRA suffer the same fate. Section 1437c-1 requires public housing agencies, like CHA, to submit to HUD every five years a plan that includes the agency's mission statement for serving the needs of the low-income families in its jurisdiction and a statement of the goals and objectives that will enable it to serve those needs. 42 U.S.C. § 1437c-1(a). The section sets forth the required contents of those plans, including "[a] certification by the public housing agency that [it] . . . will affirmatively further fair housing." *Id.* § 1437c-1(d)(15).

Like section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA does not suggest Congressional intent to confer enforceable rights on plaintiffs. *See id.* The section says nothing about a private right of action, and its focus is on public housing agencies' responsibility to report to HUD, not on their responsibilities to their tenants. Moreover, the duty QHWRA imposes on CHA to further fair housing is, like HUD's FHA duty to do the same, too vague to be enforced. Accordingly, plaintiffs' section 1983 claims based on section 1437c-1(d)(15) are dismissed with prejudice.

The same is true for plaintiffs' claims grounded in Executive Orders 11063 and 12982. Because those Orders simply reiterate HUD's duty to affirmatively further fair housing, those orders cannot support section 1983 claims.[8]

---

[8]Given our conclusion that these orders do not confer any rights on plaintiffs, we need not address the issue of whether these Executive Orders are properly construed as laws of the United States for the purposes of section 1983. *Cf. Local 1498, Am. Fed'n of Gov't Employees v. Am. Fed'n of Gov't Employees, AFL/CIO*, 522 F.2d 486, 491 (5th Cir. 1975) (noting that an Executive Order issued "pursuant to [Congressional] authority providing for presidential implementation or effectuation of statutory provisions" can constitute "a law of the United States," for purposes of jurisdictional statute, but one issued solely pursuant to executive authority cannot).

Plaintiffs fare no better with their claims based on the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o). That section appears in a chapter devoted primarily to establishing the financial arrangements between HUD and public housing authorities. *See generally* 42 U.S.C. § 1437, *et seq.* Section 1437f(o) authorizes the Secretary of HUD to "provide assistance to public housing agencies for tenant-based assistance" based on specified payment standards. 42 U.S.C. § 1437f(o)(1)(A), (B). Among other things, that section sets the amount of the monthly assistance payment to eligible families, sets eligibility standards for participants and dictates the quality of the housing covered by the program. *See generally* 42 U.S.C. § 1437f(o). That section does not create a private right of action or contain any indication that Congress intended it to confer enforceable rights on plaintiffs. Thus, plaintiffs' section 1983 claims based on section 1437f(o) are dismissed with prejudice.

Plaintiffs also seek section 1983 relief for defendants' alleged violations of 42 U.S.C. § 1437d(l)(6) and (7). Those sections require that public housing leases contain the following provisions:

> [A]ny criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy.

> [W]ith respect to any notice of eviction or termination, notwithstanding any State law, a public housing tenant shall be informed of the opportunity, prior to any hearing or trial, to examine any relevant documents, records, or regulations directly related to the eviction or termination.

42 U.S.C. § 1437d(l)(6), (7).

Even if this section confers an enforceable right on plaintiffs, an issue we do not decide, that right would be to have a lease that contains the recited provisions. Plaintiffs allege that Lakefront violated those lease provisions, not that it failed to include them in its leases. (*See* Compl. ¶ 34.) Thus, plaintiffs could not state viable section 1983 claims against Lakefront for violating sections 1437(d)(l)(6) and (7) even if those sections conferred enforceable rights on them. *See Edwards v. Dist. of Columbia*, 821 F.2d 651, 653 n.2 (D.C. Cir. 1987) (noting that "the only rights created by § 1437d(l) itself are rights to a lease" that incorporates the enumerated provisions).

That leaves Thomas' section 1983 claims for violation of her First, Fourth and Fourteenth Amendment rights. Plaintiff alleges that these rights were violated when she was harassed, evicted and arrested in retaliation for her publication of a newsletter and denied access to relevant documents prior to a state-court eviction proceeding. (*See* Compl. ¶ 34; Reply at 12.) Thomas does not allege that NCSH, the City or CHA had any involvement in those actions or that their policies or practices caused her alleged injuries. *See Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (stating that both private and public corporations can be held liable under section 1983 only if their customs or policies caused the constitutional deprivation). Thus, to the extent she asserts her First, Fourth and Fourteenth Amendment claims against NCSH, the City or CHA those claims are dismissed.[9]

---

[9]In addition, section 1983 only prohibits actions taken "under color of state law." 42 U.S.C. § 1983. In certain circumstances private actors like NCSH will be deemed state actors but only if the state "effectively directs, controls, or encourages the actions of [the] private party" or if it "delegates a public function to [the] private entity." *Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996) (quotations omitted). Plaintiffs do not allege that either of those circumstances applies to NCSH.

Thomas has also not alleged any basis for holding the individual defendants personally liable for these claims. "[S]ection 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in [the wrongful conduct]." *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003) (quotation omitted). Thomas has not alleged that defendants Butzen, Jahn, Dean or Wetmore personally took any action to violate her rights. (*See* Compl. ¶ 6(1), (5), (6), (8).) Any claims she asserts against those defendants in their individual capacities are, therefore, dismissed.

Moreover, for the reasons stated above, if defendants Butzen, Dean and Wetmore are sued only in their official capacities, those claims must also be dismissed. *See Graham,* 473 U.S. at 165 (stating that official capacity claims are redundant of claims against employer).

That leaves defendant Lakefront. To state viable section 1983 claims against this defendant, Thomas must allege that Lakefront, acting under color of law, deprived her of a constitutional right pursuant to one of its policies or customs. *See* 42 U.S.C. § 1983; *Iskander*, 690 F.2d at 128. Thomas alleges that CHA has delegated its authority to provide low-income housing to Lakefront and/or controls Lakefront's housing operations. (*See* Compl. ¶¶ 19, 25.) Thus, she has sufficiently alleged that Lakefront acted under color of state law. *See Wade*, 83 F.3d at 905.

She has not, however, alleged that Lakefront violated her First Amendment rights pursuant to one of its policies or customs. Though Thomas claims that Lakefront harassed, arrested and evicted her for publishing a newsletter about the tenants' concerns, (*see* Compl. ¶ 34; Reply at 12), she does not allege that Lakefront has a policy of retaliating against tenants who exercise their First Amendment rights. Absent such allegations, Thomas' First Amendment claim must be dismissed.

Her Fourteenth Amendment claim suffers the same fate. The Fourteenth Amendment requires that "a person not be deprived of property without notice and an opportunity for a hearing." *Siebert v. Severino*, 256 F.3d 648, 659 (7th Cir. 2001) (quotation omitted). The state-court eviction proceeding, in which plaintiff participated, (*see* Defs.' Mem. Supp. Joint Mot. Dismiss, Ex. B, 3/17/00 Order denying Thomas' motion to vacate judgment of eviction),[10] provided her with all of the process she was constitutionally due. *See Johnson v. Ill. Dep't of Public Aid*, 467 F.2d 1269, 1273 (7th Cir. 1972) ("Our examination of the Illinois Forcible Entry and Detainer Act . . . indicates that it adequately provides the remaining plaintiffs with procedural due process."). Thus, Thomas cannot state a Fourteenth Amendment claim against Lakefront.

In her last section 1983 claim, Thomas alleges that Lakefront wrongfully arrested her. (*See* Reply at 12.) An essential element of a false arrest claim is the lack of probable cause. *Schertz v. Waupaca County*, 875 F.2d 578, 581 (7th Cir. 1989). Thomas alleges that Lakefront arrested her, or caused her to be arrested, in retaliation for publishing a newsletter. (Reply at 12.) Moreover, she says Lakefront routinely causes its tenants to be arrested on false charges. (*Id.* at 10.) Taken together, those allegations are sufficient to state a section 1983 false arrest claim against Lakefront.[11]

To summarize:

---

[10]Because the Court can take judicial notice of the court order, we can consider it on this motion to dismiss without converting it to a summary judgment motion. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) ("[T]he district court may . . . take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment.") (quotation omitted).

[11]Defendants say the statute of limitations is an independent basis for dismissing the section 1982 and 1983 claims. (*See* Mem. Supp. Def.'s Joint Mot. Dismiss at 13.) Untimeliness, however, is an affirmative defense that is not appropriate for adjudication on a Rule 12 motion. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004).

(1) Plaintiffs' claims contesting the operation of Lakefront's proposed new building are not ripe and, even if they were, plaintiffs have not alleged that they have standing to pursue them. Accordingly, those claims are dismissed for lack of subject matter jurisdiction;

(2) Plaintiffs Richardson and Thomas have no standing to assert any claims concerning the current operation of Lakefront's current facilities. Thus, any such claims they assert are dismissed for lack of subject matter jurisdiction;

(3) The State of Illinois is immune from the claims plaintiffs assert against it. Those claims, are, therefore, dismissed for lack of subject matter jurisdiction;

(4) Congresswoman Schakowsky is immune from plaintiffs' claims. The claims asserted against her are dismissed for lack of subject matter jurisdiction;

(5) HUD is immune from any section 1983 damage claims plaintiffs assert against it. Consequently, any such claims are dismissed for lack of subject matter jurisdiction;

(6) HUD does not act under color of state law. Thus, any section 1983 claims plaintiffs assert against it for non-monetary relief are dismissed with prejudice;

(7) Any section 1983 claims grounded in Section 3608(e)(5) of the FHA, section 1437c-1(d)(15) of the QHWRA, the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), and Executive Orders 11063 and 12892 that plaintiffs assert against Lakefront, NCSH, the City, CHA, Wetmore, Dean, Butzen and Jahn are dismissed with prejudice;

(8) Any section 1982 claims plaintiffs assert against NCSH, the City, Jahn, Butzen, Dean and Wetmore, individually, are dismissed without prejudice;

(9) Any section 1982 claims plaintiffs assert against Butzen, Dean and Wetmore in their official capacities are dismissed with prejudice;

(10) Any section 1983 claims that Thomas asserts against NCSH, the City or CHA or against Butzen, Jahn, Dean or Wetmore in their personal capacities for violations of her First or Fourth Amendment rights are dismissed without prejudice;

(11) Any section 1983 claims that Thomas asserts against Butzen, Jahn, Dean or Wetmore in their official capacities for violations of her First or Fourth Amendment rights are dismissed with prejudice.

(12) Any section 1983 claim that Thomas asserts against Lakefront for violations of her First Amendment rights is dismissed without prejudice;

(13) Any section 1983 claims that Thomas asserts against Lakefront, NCSH, the City, CHA, Butzen, Dean, Jahn or Wetmore for violations of her Fourteenth Amendment rights are dismissed with prejudice;

(14) Plaintiffs' request that the Court enjoin the Chicago City Council and the Illinois Legislature from enacting legislation with respect to Lakefront's proposed new facility are stricken; and

(15) Defendant CHAC, which has not been served in the year since this case was filed, is dismissed without prejudice for lack of timely service.

The only claims that remain in this suit are Thomas' section 1982 claims against HUD, CHA and Lakefront and her section 1983 claim against Lakefront for false arrest.


## Conclusion

For the reasons stated above defendants' joint motion to dismiss [doc. no. 49] is granted in part and denied in part. Defendant CHAC is dismissed without prejudice for lack of timely service. Plaintiffs have fourteen days from the date of this Memorandum Opinion and Order to amend their complaint in accordance with this Order. If plaintiffs do not do so within that time period, the Court will assume they do not wish to pursue the dismissed claims and will dismiss them with prejudice.

**SO ORDERED.**                                    **ENTERED:**    9/26/05

HON. RONALD A. GUZMAN
United States District Judge